1

2

3

4

5

6

7

8

9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

10   HADASSAH SHELLENBERGER,                    CASE NO. C24-0657JLR

11                          Plaintiff,          ORDER

12        v.

13   AIG WARRANTYGUARD, INC., et
     al.,

14

15                          Defendants.

16

## I.    INTRODUCTION

Before the court are Defendant AIG WarrantyGuard, Inc.'s ("AIGWG") and

Defendant Whirlpool Corporation's ("Whirlpool" and together with AIGWG,

"Defendants") motions to dismiss Plaintiff Hadassah Shellenberger's putative class

action complaint.  (AIGWG Mot. (Dkt. # 23); Whirlpool Mot. (Dkt. # 26); *see also*

AIGWG Reply (Dkt. # 42); Whirlpool Reply (Dkt. # 41); Compl. (Dkt. # 1).)  Defendants

join in each other's motions.  (AIGWG Mot. at 2 n.2; Whirlpool Mot. at 9 n.1.)  Ms.

1    Shellenberger opposes the motions.  (AIGWG Resp. (Dkt. # 37); Whirlpool Resp. (Dkt.

2    # 38).)  The court has considered the motions, the parties' submissions in support of and

3    in opposition to the motions, the relevant portions of the record, and the applicable law.

4    Being fully advised,[1] the court GRANTS Defendants' motions.

## II.    BACKGROUND

6        Whirlpool manufactures home appliances under various brand names, including

7    KitchenAid.  (Compl. ¶¶ 1, 20.)  Together, Whirlpool and AIGWG "market, sell, and

8    administer" warranty plans to consumers who purchase Whirlpool appliances.  (*Id.* ¶ 30.)

9    This putative class action concerns Ms. Shellenberger's purchase of Defendants'

10   warranty plan (the "Service Plan"), which provided inferior coverage than she expected

11   for her new KitchenAid dishwasher.  Ms. Shellenberger alleges as follows.

12       Around April 2020, Ms. Shellenberger purchased a KitchenAid dishwasher at Best

13   Buy for $1,084.99, as well as a Geek Squad protection plan ("GSP Plan") to cover the

14   repair costs of any potential malfunctions.  (*Id.* ¶¶ 39-40.)  Beginning around the same

15   time, Ms. Shellenberger began receiving marketing communications from Defendants.

16   (*Id.* ¶ 40.)  One of these communications, which was either mailed or emailed to her,

17   urged her "to protect her investment by purchasing a KitchenAid Service Plan."  (*Id.*; *see*

18   *also id.* ¶ 41 (alleging Ms. Shellenberger continued to receive these marketing

19   communications through 2023, and attaching examples of letters that use "identical

---

21       [1]  AIGWG requests oral argument (AIGWG Mot. at 1), but the other parties do not (*see*
22   Whirlpool Mot. at 1; AIG Resp. at 1; Whirlpool Resp. at 1).  The court determines oral argument
     would not aid in its disposition of the motions.  *See* Local Rules W.D. Wash. LCR 7(b)(4).

1  language" as the original offer), Exs. 4-6 ("Mktg. Materials").)  This marketing offer

2  described the Service Plan as providing "repair or replacement benefits for covered

3  malfunctions at no out-of-pocket expenses to the consumer and paying for 100% of the

4  required parts and labor for such repairs." (*Id.* ¶ 42.)  The offer used KitchenAid

5  branding, claimed to provide "KitchenAid certified technicians using factory certified

6  parts," and gave the option to select from a variety of term lengths. (*Id.* ¶¶ 42-43.)  It also

7  contained a disclaimer that directed readers to a KitchenAid webpage for complete terms

8  and conditions. (*See* Mktg. Materials at 47.)[2]  At some point, Ms. Shellenberger visited

9  the KitchenAid website and viewed promotional language similar to what she had seen

10  on the mailers, though she does not remember exactly when she did so. (Compl. ¶ 46.)

11        After learning the Service Plan was cheaper than her GSP Plan, Ms. Shellenberger

12  called the number listed on Defendants' marketing offer and bought a three-year Service

13  Plan over the phone. (*Id.* ¶¶ 47-48.)  She subsequently received a confirmation email

14  with details about her Service Plan. (*Id.* ¶ 50.)  Ms. Shellenberger alleges Defendants are

15  both parties to the Service Plan contract, with Whirlpool acting as "the Service Contract

16  Administrator," and AIGWG as the "Obligor." (*Id.* ¶¶ 2, 96; *see also id.* ¶ 13 n.3, Ex.

17  8 ("Contract") at 60.)  Ms. Shellenberger later canceled her GSP Plan, for which she

18  obtained a refund. (Compl. ¶ 52.)

19        Ms. Shellenberger's dishwasher began malfunctioning soon after purchase. (*Id.*

20  ¶ 53.)  She contacted Whirlpool and obtained a replacement gasket under the

21

22      [2]  The court refers to the page numbers contained in the CM/ECF header when citing to exhibits attached to the complaint.

1   manufacturer's warranty.  (*Id.*)  This fix did not last, however, because some time later

2   Ms. Shellenberger began observing similar problems with the gasket.  (*Id.* ¶ 54.)  In

3   September 2022, she submitted a claim under her Service Plan.  (*Id.*)  She also called

4   Whirlpool, although this time, the agent informed her that because "there were no

5   appointments available in [Whirlpool's] network," Ms. Shellenberger "could hire an

6   independent repair company to fix her appliance, pay out-of-pocket fees for the services,"

7   and then "seek reimbursement from Whirlpool."  (*Id.*)  The Whirlpool agent also advised

8   that any third-party repair service must comply with various conditions before proceeding

9   with a repair, for example by performing a diagnostic test and sending a repair estimate to

10  Whirlpool.  (*Id.* ¶ 55.)  Ms. Shellenberger attempted to locate a suitable repair service but

11  "gave up" after approximately one week.  (*Id.* ¶ 56.)

12       Ms. Shellenberger continued using the malfunctioning dishwasher until February

13  2023, when it stopped working.  (*Id.* ¶¶ 56-57.)  She submitted another claim to

14  Whirlpool under her Service Plan, but "was informed that, under the terms of her Service

15  Contract, her appliance would be bought out for $764.36."  (*Id.* ¶ 57.)  When Ms.

16  Shellenberger asked whether a replacement was possible, the Whirlpool agent "told her

17  that she could either accept the Buyout or get nothing."  (*Id.*)  Ms. Shellenberger used the

18  buyout payment—supplemented with her own funds—to purchase a new dishwasher.

19  (*Id.* ¶ 59.)  Ms. Shellenberger also purchased a new warranty plan upon learning that her

20  Service Plan term ended at the time of the buyout.  (*Id.* ¶ 58.)

21       Ms. Shellenberger initiated this action on May 10, 2024, claiming Defendants'

22  marketing materials deceptively misrepresented and omitted material terms of the Service

1    Plan contract.  (*See generally id.*)  Ms. Shellenberger alleges Defendants' marketing

2    impresses upon consumers that the Service Plans are related to, and offer coverage

3    benefits comparable to, the Whirlpool manufacturer's warranty.  (*Id.* ¶¶ 4-8.)  But

4    according to Ms. Shellenberger, the Service Plans offer "inferior" coverage and allow

5    Defendants "to generate unfair profits for themselves at the expense of unsuspecting

6    consumers"—particularly through the buyout provision.  (*Id.* ¶¶ 10, 68; *see also id.*

7    ¶¶ 8-12; Contract § 20 (permitting the buyout of an appliance, rather than repair or

8    replacement, at Defendants' sole discretion).)  Ms. Shellenberger asserts claims against

9    Defendants for:  (1) violation of Washington's Consumer Protection Act ("CPA"), ch.

10   19.86 RCW; (2) breach of contract; and (3) breach of the duty of good faith and fair

11   dealing.  (Compl. ¶¶ 84-107.)  Defendants each filed a motion to dismiss the complaint,

12   describing this case as a "copycat lawsuit" based on a similar putative class action that

13   Ms. Shellenberger's attorney filed last year in the Central District of California.

14   (AIGWG Mot. at 1 & n.1 (citing *Salas v. Whirlpool Corp.*, No. 5:23-CV-01549-AB-KK,

15   2024 WL 694067 (C.D. Cal. Jan. 24, 2024)); Whirlpool Mot. at 12 & n.3 (same).)  The

16   court stayed discovery in this case pending resolution of Defendants' motions to dismiss.

17   (8/19/24 Order (Dkt. # 44).)  The motions are now ripe for decision.

18                              **III.    ANALYSIS**

19        The court begins by setting forth the relevant legal standards before turning to

20   threshold procedural matters and then the merits.  Because Defendants join in each

21   other's motions, the court analyzes the motions as one.

22   //

1   **A.   Legal Standards**

2   Subject matter jurisdiction is a threshold issue that goes to the court's power to

3   hear a case. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95 (1998). Federal

4   Rule of Civil Procedure 12(b)(1) allows a party to seek dismissal of a claim for lack of

5   subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). When subject matter jurisdiction is

6   challenged, the party asserting that jurisdiction exists bears the burden of proof. *Vacek v.*

7   *U.S.P.S.*, 447 F.3d 1248, 1250 (9th Cir. 2006).

8   In addition, Federal Rule of Civil Procedure 12(b)(6) provides for dismissal when

9   a complaint "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P.

10   12(b)(6). Under this standard, dismissal is proper when there is a "lack of a cognizable

11   legal theory or the absence of sufficient facts alleged under a cognizable legal theory."

12   *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988). A complaint must

13   "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is

14   plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl.*

15   *Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The court must construe the allegations in

16   the light most favorable to the nonmoving party, *Livid Holdings Ltd. v. Salomon Smith*

17   *Barney, Inc.*, 416 F.3d 940, 946 (9th Cir. 2005), but need not accept as true legal

18   conclusions, "formulaic recitation[s] of the legal elements of a cause of action," *Chavez*

19   *v. United State*s, 683 F.3d 1102, 1008 (9th Cir. 2012), or "allegations that are merely

20   conclusory, unwarranted deductions of fact, or unreasonable inferences," *Sprewell v.*

21   *Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001). "A claim has facial

22   plausibility when the pleaded factual content allows the court to draw the reasonable

1    inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

2    "Where a complaint pleads facts that are merely consistent with a defendant's liability, it

3    stops short of the line between possibility and plausibility of entitlement to relief." *Id.*

4    (cleaned up).

5            Ms. Shellenberger's claims under the CPA are subject to the heightened pleading

6    standards of Federal Rule of Civil Procedure 9(b), which provides that, "[i]n alleging

7    fraud or mistake, a party must state with particularity the circumstances constituting fraud

8    or mistake." Fed. R. Civ. P. 9(b); *see also Promedev, LLC v. Wilson*, No. C22-1063JLR,

9    2023 WL 2330377, at *3 (W.D. Wash. Mar. 2, 2023) (applying Rule 9(b)'s heightened

10   pleading standard to a CPA claim).  Under Rule 9(b), fraud allegations must "be specific

11   enough to give defendants notice of the particular misconduct . . . so that they can defend

12   against the charge and not just deny that they have done anything wrong." *Kearns v.*

13   *Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009) (citation omitted).  "Averments of

14   fraud must be accompanied by 'the who, what, when, where, and how' of the misconduct

15   charged." *Id.* (quoting *Vess v. Cib-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir.

16   2003)).  Rule 9(b)'s standard is relaxed, but not eliminated, with respect to fraudulent

17   omissions.  *Short v. Hyundai Motor Co.*, 444 F. Supp. 3d 1267, 1279 (W.D. Wash. Mar.

18   16, 2020).

19   **B.    Procedural Matters**

20           As a threshold matter, Defendants ask the court to consider certain documents not

21   attached to the complaint.

22   *//*

1    In general, the court's review of a motion to dismiss is limited to the allegations

2    contained in the complaint.  *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir.

3    2001).  "If a complaint is accompanied by attached documents, . . . [t]hese documents are

4    part of the complaint and may be considered in determining whether the plaintiff can

5    prove any sest of facts in support of the claim."  *Durning v. First Bos. Corp.*, 815 F.2d

6    1265, 1267 (9th Cir. 1987).  "Even if a document is not physically attached to a

7    complaint, it may be incorporated by reference into a complaint if the plaintiff refers

8    extensively to the document or the document forms the basis of the plaintiff's claim."

9    *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).  The "incorporation by

10   reference" doctrine permits consideration of documents "whose authenticy no party

11   questions," and it "applies with equal force to internet pages as it does to printed

12   material."  *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005) (quoting *In re Silicon*

13   *Graphics Inc. Sec. Litig.*, 183 F.3d 970, 986 (9th Cir. 1999)).

14   AIGWG argues the court "should consider the contents of the webpage

15   'serviceplans.kitchenaid.com/details' at the time the Complaint was filed" because "the

16   webpage has been incorporated by reference into the Complaint."  (AIGWG Mot. at 4

17   n.6; *see* Lowe Decl. (Dkt. # 24) ¶ 2, Ex. A (attaching "[a] screensot of the website

18   homepage as it appeared on June 25, 2024").)  As AIGWG explains, however,  the

19   screenshot it seeks to introduce actually reflects a "new landing page" located at

20   "whirlpooldomesticandgeneral.us," rather than the domain that appears on Defendants'

21   marketing materials.  (AIGWG Mot. at 4 n.6.)  Because Ms. Shellenberger disputes the

22   //

1  authenticity of the webpage at issue (AIGWG Resp. at 16 n.4), the court declines to

2  consider the document. *Knievel*, 393 F.3d at 1076.

3       In addition, Defendants each attempt to introduce a copy of Ms. Shellenberger's

4  GSP Plan, arguing it is extensively referenced throughout the complaint.  (AIGWG Mot.

5  at 4; Lowe Decl. ¶ 3, Ex. B; Whirlpool Mot. at 9 n.2; Harris Decl. ¶ 3, Ex. 1.)  But

6  because Ms. Shellenberger disputes the authenticity of these documents (AIGWG Resp.

7  at 5 n.2), the court likewise declines to consider them.  *Knievel*, 393 F.3d at 1076.

8  **C.**    **Article III Standing**

9       Defendants first seek dismissal pursuant to Rule 12(b)(1) based on the absence of

10  subject matter jurisdiction, arguing Ms. Shellenberger lacks Article III standing.

11  (AIGWG Mot. at 9-12.)  The court disagrees.

12       At the pleading stage, a plaintiff must clearly allege facts demonstrating each

13  element of standing under Article III of the United States Constitution.  *Spokeo, Inc. v.*

14  *Robins*, 578 U.S. 330, 338 (2016).  To plead standing, a plaintiff must allege that she

15  "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the

16  defendant, and (3) that is likely to be redressed by a favorable judicial decision."  *Id.*

17  (quoting *Warth v. Seldin*, 422 U.S. 490, 518 (1975)).  "To establish injury in fact, a

18  plaintiff must show that he or she suffered 'an invasion of a legally protected interest'

19  that is 'concrete and particularized' and 'actual or imminent, not conjectural or

20  hypothetical.'"  *Id.* at 339 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)).

21  In the consumer protection context, a plaintiff can plead an "overpayment theory" of

22  injury by alleging "she paid more for a product than she otherwise would have due to a

1    defendant's false representations about the product." *McGee v. S-L Snacks Nat.*, 982

2    F.3d 700, 706 (9th Cir. 2020) (citing *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 595

3    (9th Cir. 2012) (holding plaintiffs pled injury in fact where they allegedly bought a

4    product "when they otherwise would not have done so" due to the defendant's "deceptive

5    claims")).  A plaintiff can plead a "benefit of the bargain theory" of injury by alleging

6    "she bargained for a product worth a given value but received a product worth less than

7    that value." *Id.* at 705-06 (quoting *In re Johnson & Johnson Talcum Powder Prods.*

8    *Mktg., Sales Pracs. & Liab. Litig.*, 903 F.3d 278, 283 (3d Cir. 2018)).  To successfully

9    plead a benefit of the bargain theory, a plaintiff "must do more than allege that she did

10   not receive the benefit she *thought* she was obtaining." *Id.* at 706 (cleaned up).  She

11   "must show that she did not receive a benefit for which she actually *bargained*." *Id.*

12       Here, Ms. Shellenberger alleges both an overpayment theory and a benefit of the

13   bargain theory of injury.  First, Ms. Shellenberger alleges she overpaid because she

14   would not have purchased the Service Plan but for Defendants' deceptive marketing (*see*

15   Compl. ¶¶ 18, 61, 88), which provides an independent basis for Article III standing.  *See*

16   *Mazza*, 666 F.3d at 595.  Second, Ms. Shellenberger asserts a benefit of the bargain

17   theory by alleging Defendants made false representations that the Service Plan included

18   certain benefits that she did not receive—including full term coverage and no

19   out-of-pocket repair expenses—rendering her plan less valuable than the plan for which

20   she bargained.  (*See* Compl. ¶¶ 42-45, 51, 54, 58, 66-67, 86-87, 96-99, 104-05.)  This,

21   too, provides an independent basis for Article III standing.  *See McGee*, 982 F.3d at

22   705-06.

1    Defendants challenge Ms. Shellenberger's benefit of the bargain theory of injury.

2    (*See* AIGWG Mot. at 9-12; AIGWG Reply at 2-3.)  In Defendants' view, Ms.

3    Shellenberger lacks standing because "[t]he terms and conditions in the Service

4    Contract . . . were clearly part of [her] bargain" (AIGWG Mot. at 12), and she therefore

5    fails to "allege that she did not receive a benefit *for which she actually bargained*"

6    (AIGWG Reply at 2 (citing *McGee*, 982 F.3d at 706)).  Defendants' reliance on *McGee*

7    overlooks a critical distinction:  that case did not involve any alleged misrepresentations,

8    whereas this case does.  *See McGee*, 982 F.3d at 707 (holding plaintiff lacked standing

9    because defendant made no representations about its product's safety, and plaintiff's

10   assumptions that the product was safe "were not included in the bargain").  That

11   distinction matters.  Relying on one's own assumptions about the benefits of a bargain in

12   the absence of any alleged misrepresentations by the defendant is not the same as

13   affirmatively relying on a defendant's false or misleading representations about the

14   benefits of that bargain.  *See id.* (explaining that where a consumer purchases a product

15   based on the defendant's "representation of its safety," the representation is "part of the

16   benefit of her bargain" and the plaintiff does "not receive the benefit of her bargain" if

17   the "representation was false" (quoting *In re Johnson*, 903 F.3d at 298 (Fuentes, J.,

18   dissenting))).  Here, Ms. Shellenberger's assumptions about the Service Plan's benefits

19   did not come from thin air; she alleges they resulted from Defendants' false

20   representations.  That is a viable benefit of the bargain theory under *McGee*.

21       Accordingly, the court concludes Ms. Shellenberger has Article III standing to

22   pursue her claims.

**D.     Failure to State a Claim**

Defendants next seek dismissal pursuant to Rule 12(b)(6), arguing Ms.

Shellenberger fails to state a claim.  The court concludes dismissal is warranted as to each

claim.

1.   CPA

The CPA makes unlawful "[u]nfair methods of competition and unfair or

deceptive acts or practices in the conduct of any trade or commerce."  RCW 19.86.020.

To state a claim under the CPA, a plaintiff must allege an (1) unfair or deceptive act or

practice; (2) occurring in trade or commerce; (3) public interest impact; (4) injury to the

plaintiff in her business or property; and (5) causation.  *Hangman Ridge Training Stables,*

*Inc. v. Safeco Title Ins. Co.*, 719 P.2d 531, 533 (Wash. 1986).  "The failure to establish

any of the elements is fatal to a CPA claim."  *Holiday Resort Com. Ass'n v. Echo Lake*

*Assocs., LLC*, 135 P.3d 499, 507 (Wash. Ct. App. 2006).  As noted, CPA claims are

subject to Rule 9(b)'s heightened pleading standard.  (*See supra* § III(A).)

Here, Ms. Shellenberger asserts a litany of grievances about her Service Plan (*see*

Compl. ¶¶ 1-19, 29-68), without enumerating or citing the particular misrepresentations

and omissions that she challenges in connection with her CPA claims (*id.* ¶¶ 86-87).  The

amorphous nature of Ms. Shellenberger's CPA claims makes it difficult to evaluate their

sufficiency.  Indeed, in endeavoring to comprehensively address all of the possible CPA

theories raised in the complaint, Defendants raise numerous arguments that cover

significant ground.  (*See generally* AIGWG Mot.; Whirlpool Mot.)  At bottom, however,

the parties dispute three CPA elements—deception, injury, and causation—and whether

1    the factual allegations satisfy Rule 9(b).  For a variety of reasons, the court concludes that

2    none of the challenged misrepresentations or omissions is sufficiently pleaded.

3         a.  Deception

4         A CPA claim "may be predicated upon . . . an act or practice that has the capacity

5    to deceive substantial portions of the public."  *Young v. Toyota Motor Sales, U.S.A.*, 472

6    P.3d 990, 994 (Wash. 2020) (quoting *Klem v. Wash. Mut. Bank*, 295 P.3d 1179, 1187

7    (Wash. 2013)).  "Deception exists 'if there is a representation, omission or practice that is

8    likely to mislead' a reasonable consumer."  *Id.* (quoting *Panag v. Farmers Ins. Co. of

9    Wash.*, 204 P.3d 885, 895 (Wash. 2009)).  "In evaluating the tendency of language to

10   deceive," courts "look not to the most sophisticated readers but rather to the least."

11   *Panag*, 204 P.3d at 895 (quoting *Jeter v. Credit Bureau, Inc.*, 760 F.2d 1168, 1174 (11th

12   Cir. 1985)).  "Whether a particular act or practice is 'unfair or deceptive' is a question of

13   law."  *Id.* at 894.

14        Defendants argue Ms. Shellenberger fails to allege an unfair or deceptive act or

15   practice because much of the challenged conduct is permitted by and conspicuously

16   disclosed in the Service Plan contract.  (AIGWG Mot. at 12-16.)  As Defendants explain,

17   the marketing materials that allegedly induced Ms. Shellenberger to buy a Service Plan

18   expressly stated that the "complete terms and conditions" were available on Defendants'

19   website.  (AIGWG Mot. at 13 (quoting Mktg. Materials at 47).)  In Defendants' view,

20   Ms. Shellenberger "cannot rest a CPA claim on her own refusal to review available

21   contractual terms and conditions."  (*Id.* at 13-14; *see also* Whirlpool Mot. at 20-22.)  In

22   opposition, Ms. Shellenberger does not meaningfully respond to Defendants' argument

1   that she was afforded the opportunity to view the contract online prior to purchase.  (*See*

2   *generally* AIGWG Resp.; Whirlpool Resp.)  Instead, she emphatically argues that the

3   contract is immaterial because "[s]he did not view or rely on" it in purchasing her Service

4   Plan, and "nothing on record" shows that she received or read the contract at any time.

5   (*See* AIGWG Resp. at 16-18.)  The court agrees with Defendants.

6         To begin, the contract specifically addresses most all of the allegedly deceptive

7   conduct referenced in the complaint.  This includes (but is not necessarily limited to)

8   misrepresentations and omissions concerning:  Defendants' entitlement to pay for, rather

9   than furnish, the labor and materials necessary for repairs (*see* Compl. ¶¶ 13, 54);

10  Defendants' entitlement to exercise a buyout at their option (*see id.* ¶¶ 8, 42, 44, 64(a));

11  the settlement payout value (*see id.* ¶¶ 8-9, 64(b)-(c)), 65(b)-(d)); the requirement to

12  surrender the covered appliance upon a buyout (*see id.* ¶¶ 8, 44, 64(e)); and the

13  termination of coverage upon a buyout (*see id.* ¶¶ 43, 45, 64(d)).  (*See* Contract §§ 1, 20

14  (disclosing all of these terms).)  The contract likewise addresses Ms. Shellenberger's

15  allegation of an "undisclosed Payout Limit" that Defendants apply in deciding whether to

16  pursue a repair versus a replacement or buyout.  (Compl. ¶¶ 65(b)-(d) ("When the

17  estimated repairs under a claim exceed the Payout Limit, Defendants routinely exercise

18  their Buyout option even if the product can be repaired.").)  Indeed, the contract states

19  that Defendants "will" "complete the *lesser* of" (a) a repair, or (b) a replacement or

20  buyout, and that the value of a replacement or buyout will not exceed 75% of the original

21  purchase price in any case.  (Contract §§ 10 (emphasis added), 20 (setting forth a

22  "depreciation schedule" that Defendants use to determine the buyout value of a particular

1   product based on its age).)  Under the plain terms of the contract, Defendants will *always*

2   elect a buyout where the cost of a repair exceeds the maximum buyout value as set forth

3   in the depreciation schedule.  Thus, the payout limit, and many other allegedly deceptive

4   terms as set forth above, were readily discoverable to any consumer upon a simple review

5   of the contract.[3]

6        Moreover, the contract was available to Ms. Shellenberger prior to purchase.  As

7   Ms. Shellenberger acknowledges, Defendants' allegedly deceptive marketing materials

8   contained a "disclaimer" that the complete terms and conditions could be viewed at

9   "serviceplans.kitchenaid.com/details."  (AIGWG Resp. at 16; *see* Mktg. Materials at 47.)

10   "In other words," Defendants put Ms. Shellenberger on notice "that the marketing

11   materials did *not* contain the 'complete terms and conditions' of the Service Contract."

---

[3] Ms. Shellenberger further alleges that "[i]t is Defendants' business policy to increase their profits through the systematic exercise of Buyouts which Defendants use to avoid having to repair or replace an appliance that is covered under a Whirlpool Plan." (Compl. ¶ 65(a).)  But this generalized allegation is wholly unsupported by the facts of Ms. Shellenberger's case, where Defendants "cho[se] to resolve [her] 2022 claim with a repair" and offered to reimburse her for the same before later exercising a buyout.  (*Id.* ¶¶ 54-59, 105.)  The court therefore declines to credit the allegation that Defendants implement "a systematic exercise of Buyouts" to "increase their profits." (*Id.* ¶ 65(a)); *see Sprewell*, 266 F.3d at 988 (stating the court need not "accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences"); *see also Twombly*, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level.").

In addition, Ms. Shellenberger alleges that when she submitted her September 2022 claim, a Whirlpool agent told her "there were no appointments available in her network." (Compl. ¶ 54.)  Based on this single fact, Ms. Shellenberger asserts that "access to factory certified technicians under the [Service] Plan is inferior to that available under the Whirlpool Warranty," and if she had known this, "she would not have purchased a [Service] Plan." (*Id.* ¶¶ 54, 60-61, 68.)  Ms. Shellenberger neither provides a copy of the manufacturer's warranty nor alleges any concrete facts regarding the availability of technicians under the warranty.  (*See generally id.*)  The court therefore declines to credit the allegation that the Service Plan provides inferior access to certified technicians than the manufacturer's warranty.  *See Sprewell*, 266 F.3d at 988; *see also Twombly*, 550 U.S. at 555.

1   (AIGWG Mot. at 13.)  Ms. Shellenberger could have reviewed those complete terms and

2   conditions on Defendants' website before purchase, allowing her to make an informed

3   decision whether or not to buy the Service Plan upon discovering the contract terms that

4   she now finds objectionable.  (*See* Mktg. Materials at 47 (directing consumers to

5   Defendants' website for complete terms and conditions); Compl. ¶ 58, n.3 (alleging the

6   Service Plan contract was available on Defendants' website); *see generally* Contract).)

7   Her failure to do so does not amount to deception.

8         Ms. Shellenberger suggests that the disclaimer was ineffective insofar as it

9   appeared in "fine print" (AIGWG Resp. at 17), and that the marketing materials created a

10  "deceptive net impression" notwithstanding the disclaimer (Whirlpool Resp. at 12-14).

11  The court disagrees.  The disclaimer was written in plain English, and it was not hidden

12  or difficult to read.  In fact, immediately next to "KitchenAid Service Plan Benefits,"

13  which appears near the top of the mailer in bold typeface and relatively large font, is a

14  bold aterisk directing the viewer's attention to the disclaimer at the bottom of the page.

15  (*See* Mkt. Materials at 47, 52, 55.)  Any reasonable consumer—even the least

16  sophisticated reader—would notice the disclaimer and understand its message.  *See*

17  *Freeman v. Time, Inc.*, 68 F.3d 285, 289-90 (9th Cir. 1995) (holding, under California

18  law, that qualifying language in promotional mailers was not "hidden or unreadably

19  small" and no reasonable consumer would ignore it).  Ms. Shellenberger's cited cases do

20  not aid her "deceptive net impression" argument because, with respect to each one, either

21  the facts are distinguishable or the court did not actually find a deceptive net impression.

22  (*See* Whirlpool Resp. at 12); *Amazon.com Servs. LLC v. Paradigm Clinical Rsch. Inst.,*

1   *Inc.*, No. C21-0753JNW, 2024 WL 1345197, at *1-2, *7 (W.D. Wash. Mar. 29, 2024)

2   (involving deceptive net impression based on statements that were apparently untethered

3   to any qualifying or disclaiming language); *Keithly v. Intelius Inc.*, 764 F. Supp. 2d 1257,

4   1267-69 (W.D. Wash. 2011) (concluding online transaction created deceptive net

5   impression where defendant failed to "draw attention to important disclosures," but

6   finding no deceptive net impression in different transaction where "a reasonable

7   consumer could not [have] ignore[d] or skim[med] over" a conspicuous though imperfect

8   disclosure); *REX-Real Est. Exch. Inc. v. Zillow Inc.*, No. C21-0312TSZ, 2021 WL

9   2352043, at *7 (W.D. Wash. June 9, 2021) (concluding plaintiff failed to meet burden of

10  showing deceptive net impression).[4]

11      The court is similarly unpersuaded by Ms. Shellenberger's argument that in

12  purchasing the Service Plan, she relied only on the marketing materials and a subsequent

13

14  _____

    [4] Ms. Shellenberger does not substantively respond to Defendants' argument that the
    *contract terms* (as opposed to the disclaimer) are set forth clearly and conspicuously, calling this

15  argument a "red herring." (AIGWG Resp. at 18; *see also* AIGWG Mot. at 14-15; Whirlpool
    Mot. at 21-22.) Ms. Shellenberger is correct to the extent that this argument imports principles

16  of California law that are inapplicable here. (*See* AIGWG Mot. at 15 (citing *Salas*, 2024 WL
    694067, at *7 (holding the contract terms were "clear and conspicuous" within the meaning of
    California's consumer protection statute))); *see also* Cal. Civ. Code § 1794.4(c)(5)(A)-(B)

17  (requiring certain service contract terms to be "clear and conspicuous"). In Washington,
    however, the format of contract terms is relevant to the question of procedural unconscionability,

18  which can be relevant to CPA claims. *See Zuver v. Airtouch Commc'ns, Inc.*, 103 P.3d 753,
    759-60 (Wash. 2004) (stating "procedural unconscionability" is the lack of meaningful choice,
    considering whether the important contract terms were hidden "in a maze of fine print," among

19  other factors); *State v. Kaiser*, 254 P.3d 850, 860 (Wash. Ct. App. 2011) (holding "unfair and
    unconscionable agreements . . . violated the CPA"). Although Ms. Shellenberger does not

20  expressly argue the contract is procedurally unconscionable or otherwise invalid, she vaguely
    alleges certain contract terms are "not clearly disclosed" and "buried under misleading

21  headings." (Compl. ¶ 64.) To remove any doubt, the court concludes for the reasons set forth in
    AIGWG's motion that the contract terms are clear and conspicuous and not hidden in a maze of

22  fine print.

1    phone call rather than the contract.  (*See* AIGWG Resp. at 16, 19-20.)  First, reliance

2    concerns a separate element of a CPA claim—causation—and is not a component of the

3    deception element.  *Young*, 472 P.2d at 994.  Second, accepting this argument would

4    encourage CPA claims premised on a consumer's blind ignorance.  The case law,

5    however, overwhelmingly supports Defendants' position that a consumer cannot plead

6    deception under the CPA based on "surprise" contract terms that were fully and

7    sufficiently disclosed to her, but that she failed to read before signing on the dotted line.

8    *See, e.g.*, *In re Amazon Serv. Fee Litig.*, No. C22-0743TL, 2024 WL 3460939, at *8-9

9    (W.D. Wash. July 18, 2024) (finding no deception based on supposedly hidden fees that

10   were disclosed at checkout and permitted by the terms and conditions to which

11   subscribers had agreed); *Storey v. Amazon.com Servs. LLC*, No. C23-1529KKR, 2024

12   WL 2882270, at *6 (W.D. Wash. July 7, 2024) (rejecting theory that "reasonable

13   consumers do not read all of the terms and conditions of their contracts or should not be

14   expected to do so" and dismissing CPA claim); *Haywood v. Amazon.com, Inc.*, No.

15   C22-1094JHC, 2023 WL 4585362, at *7 (W.D. Wash. July 18, 2023) ("[E]xercising a

16   right a that a contract permits and is fully disclosed to the parties in advance is not an

17   unfair or deceptive act or practice."); *Lowden v. T-Mobile USA, Inc.*, No. C05-1482MJP,

18   2009 WL 537787, at *3 (W.D. Wash. Feb. 18, 2009) (finding no deception where

19   contract "sufficiently disclosed" the challenged conduct); *Smale v. Cellco P'ship*, 547 F.

20   Supp. 2d 1181, 1189 (W.D. Wash. 2008) (finding no deception where defendant

21   "disclosed from the inception of its relationship with each Plaintiff that it could charge

22   additional fees"); *see also Cole v. Keystone RV Co.*, No. C18-5182TSZ, 2021 WL

1  3111452, at *4-5 (W.D. Wash. July 22, 2021) (concluding the disclosure of material

2  information online, rather than by plaintiff's "preferred method," did "not itself constitute

3  a deceptive act under the CPA").

4       In short, Defendants' marketing materials expressly directed Ms. Shellenberger to

5  the complete terms and conditions of a valid contract that she could have reviewed before

6  freely entering.  Ms. Shellenberger cannot ignore readily available contract terms and

7  then plausibly claim she was deceived by those terms.[5]

8       *b. Causation*

9   "[W]here a defendant has engaged in an unfair or deceptive act or practice, and

10  there has been an *affirmative misrepresentation* of fact, our case law establishes that there

11  must be some demonstration of a causal link between the misrepresentation and the

12  plaintiff's injury."  *Deegan v. Windermere Real Est./Ctr.-Isle, Inc.*, 391 P.3d 582, 587

13  (Wash. Ct. App. 2017) (quoting *Indoor Billboard/Wash., Inc. v. Integra Telecom of*

14  *Wash., Inc.*, 170 P.3d 10, 22 (Wash. 2007)); *cf. id.* at 589 (noting "causation under the

15  CPA for omission of material facts includes a rebuttable presumption of reliance").  To

16  prove causation, "[a] plaintiff must establish that, but for the defendant's unfair or

17  deceptive practice, the plaintiff would not have suffered an injury."  *Indoor Billboard*,

18  170 P.3d at 22.  Reliance is one way to establish the necessary causal link.  *Deegan*, 391

19

20          [5]  To the extent Ms. Shellenberger alleges deception based on misrepresentations and/or

21  omissions regarding the Service Plan offeror (*see* Compl. ¶¶ 3-5, 33, 42), that argument similarly
fails because the disclosure in Defendants' marketing materials expressly states that "KitchenAid
Service Plans are offered, sold and issued by AIG WarrantyGuard, Inc.," and that "KitchenAid is

22  not affiliated with AIG" (Mktg. Materials at 47, 52, 55).

1    P.3d at 587. *see also Young*, 472 P.3d at 996-97 (affirming dismissal for failure to

2    establish reliance where the plaintiff advanced no other theory of causation).

3            The court agrees with Defendants that Ms. Shellenberger fails to plausibly allege

4    reliance (and thus, causation) in connection with Defendants' alleged misrepresentations.

5    Although Ms. Shellenberger argues "reliance is not a necessary element of a CPA claim"

6    (Whirlpool Resp. at 9), Defendants correctly note that she "has articulated no other

7    theory" (Whirlpool Reply at 8).  And the complaint is wholly devoid of allegations

8    explaining the particular misrepresentations on which Ms. Shellenberger relied in

9    purchasing her Service Plan.  (*See generally* Compl.)  For example, Ms. Shellenberger

10   generally alleges that Defendants' promotional activities "leave consumers with the

11   impression" that the Service Plans "effectively work as an extension of Whirlpool's

12   original manufacturer's warranty" and "offer protection comparable to the Whirlpool

13   Warranty." (Compl. ¶ 4; *see also id.* ¶ 14 ("Thousands of consumers purchase AIGWG's

14   service plans each year under the mistaken belief that they are purchasing extensions to

15   Whirlpool's manufacturer's warranties.").)  But Ms. Shellenberger does not connect these

16   allegations to her own consumer experience whatsoever.  (*See generally id.*; *see also*

17   Whirlpool Mot. at 19 (observing Ms. Shellenberger "does not allege that she purchased

18   *her* [Service Plan] based on that mistaken belief").)

19           As it stands, the allegations show Ms. Shellenberger considered nothing other than

20   price in deciding to purchase the Service Plan.  (Compl. ¶ 47 ("After viewing the pricing

21   for the KitchenAid Plan and seeing it was lower than what she had paid for her GSP Plan,

22   [Ms.] Shellenberger reasoned that she could save money by cancelling her GSP Plan to

1    obtain a refund and purchasing a KitchenAid Plan instead.").)  Accordingly, the court

2    concludes that Ms. Shellenberger fails to plausibly allege causation with respect to

3    Defendants' alleged misrepresentations.

4           *c.  Rule 9(b) Particularity*

5           Finally, many of Ms. Shellenberger's allegations fall short of Rule 9(b)

6    requirements.  Ms. Shellenberger merely describes the content of Defendants' marketing

7    materials without identifying what she actually read, aside from the pricing and coverage

8    term options.  (*See id.* ¶¶ 40-45, 47.)  Thus, she fails to specify which portions of the

9    marketing "[s]he found material" and what "[s]he relied upon" in deciding to buy her

10   Service Plan.  *Kearns*, 567 F.3d at 1126.  Particularly hollow are Ms. Shellenberger's

11   vague allegations that she viewed "the representation" attached to the complaint at

12   Exhibit 7 when she "visited the KitchenAid website" at some unknown time.  (Compl.

13   ¶ 46 (stating "[Ms.] Shellenberger does not remember the exact date of this visit); *see*

14   *also id.*, Ex. 7 (containing many different representations).)  Without pleading the "what"

15   or "when" of this website visit, Ms. Shellenberger fails to allege with particularity how

16   any specific representation on the website fraudulently induced her to purchase a Service

17   Plan.  Thus, Ms. Shellenberger fails to meet Rule 9(b) requirements with respect to

18   Defendants' alleged misrepresentations.

19          In sum, Ms. Shellenberger fails to state a claim under the CPA, and this claim is

20   dismissed.

21   //

22   //

1          2.  <u>Breach of Contract</u>

2          A party asserting a breach of contract claim must allege the existence of a valid

3    contract between the parties, breach, and resulting damage.  *See Lehrer v. Wash. Dep't of*

4    *Soc. & Health Servs.*, 5 P.3d 722, 727 (Wash. Ct. App. 2000); *see also Nw. Indep. Forest*

5    *Mfrs. v. Dep't of Lab. & Indus.*, 899 P.2d 6, 9 (Wash. Ct. App. 1995) ("A breach of

6    contract is actionable only if the contract imposes a duty, the duty is breached, and the

7    breach proximately causes damage to the claimant.").  The parties here dispute whether

8    Ms. Shellenberger has sufficiently alleged breach and damages.

9          Beginning with breach, Ms. Shellenberger alleges Defendants breached the

10   Service Plan contract "by failing to provide her with repair, replacement, or Buyout

11   benefits of the claim she submitted around September 2022."  (Compl. ¶ 98.)  But Ms.

12   Shellenberger does not identify in her complaint the particular contract provision that she

13   alleges Defendants breached, which independently dooms her claim.  *See Block Mining,*

14   *Inc. v. Hosting Source LLC*, No. C24-0319JLR, 2024 WL 3012948, at *10 (W.D. Wash.

15   June 14, 2024) (stating "federal courts regularly dismiss unadorned breach of contract

16   claims where the claimant fails to cite the contractual provision that was allegedly

17   breached," and collecting cases).

18         Ms. Shellenberger clarifies in opposition that her claim rests on Sections 1 and 10

19   of the contract.  (*See* Whirlpool Resp. at 20-21.)  Section 1 requires Defendants to

20   "furnish labor, parts, and/or replacement equipment (or pay for the same) necessary to

21   repair" a covered appliance.  (Contract § 1.)  Section 10 requires Defendants to, at their

22   option, "*complete* the lesser of (a) repair of Your Product with new or refurbished parts,

or (b) Exchange or Buyout Your Product." (*Id.* § 10 (emphasis added).)  According to Ms. Shellenberger, Defendants failed to fulfill these contractual obligations because they never completed a repair, replacement or a buyout of her faulty dishwasher in connection with her September 2022 claim.  (AIGWG Resp. at 23.)

Even if Ms. Shellenberger had made these allegations in her complaint, they would still fall short.  The contract expressly permits Defendants to elect, in their sole discretion, a repair, replacement, or buyout.  (Contract § 10.)  In the event of repair, the contract unambiguously permits Defendants to fulfill their repair obligations by "pay[ing]" for—rather than providing—repair services.  (*Id.* § 1 ("We will furnish labor, parts, and/or replacement equipment (*or pay for the same*) . . . ." (emphasis added)).)  That is exactly what Ms. Shellenberger alleges Defendants offered in response to her September 2022 claim.  (Compl. ¶ 54 ("Whirlpool informed [Ms.] Shellenberger that . . . she could hire an independent repair company to fix her appliance" and then "seek reimbursement from Whirlpool.").)  It was Ms. Shellenberger who "gave up" on locating a possible repair service and did not seek reimbursement.  (*Id.* ¶ 56.)  After Ms. Shellenberger submitted a second claim for the same dishwasher five months later, Defendants fulfilled all of their contractual obligations with respect to Ms. Shellenberger's dishwasher by completing a buyout.  (Compl. ¶¶ 57-59; *see* Contract §§ 12 ("All contractual obligations for the specified Product are fulfilled, in lieu of repairs, upon Exchange or Buyout of Your Product."), 16 ("Once you have received Your Product Exchange or Buyout, all of Our contractual obligations for the specified Product have been fulfilled."), 20 ("We will have satisfied all contractual obligations owed for the

1    specific Product if We Exchange or Buyout Your Product under this section.").)

2    Accordingly, Defendants' alleged conduct fully conformed with the contract and

3    Defendants satisfied all of their obligations under that contract.  *See Haywood*, 2023 WL

4    4585362, at *4 ("[A] breach of contract claim is not legally cognizable when based on

5    conduct that the contract permits.").

6          The court rejects Ms. Shellenberger's invitation to treat her September 2022 and

7    February 2023 warranty claims as wholly independent from one another for breach of

8    contract purposes.  (*See* AIGWG Resp. at 22; Whirlpool Resp. at 21-22.)  Ms.

9    Shellenberger essentially argues Defendants breached the contract by failing to resolve

10   her September 2022 claim by the time she filed a second claim for the same product five

11   months later.  The contract imposes no such deadline.  (*See generally* Contract.)  More

12   fatally, this argument is directly undermined by Sections 12, 16, and 20 of the contract,

13   which provide that a buyout resolves *all* contractual obligations for the covered product.

14   (*See* Contract §§ 12, 16, 20.)  Ms. Shellenberger cannot allege a breach rooted in her

15   September 2022 claim alone because, under multiple provisions of the contract,

16   Defendants fulfilled their obligations stemming from that claim when they bought out her

17   appliance at a later date.

18         Ms. Shellenberger's damages allegations fare no better.  In Washington, contract

19   damages are ordinarily based on "an injured party's reasonably expected benefit of the

20   bargain."  *Ford v. Trendwest Resorts, Inc.*, 43 P.3d 1223, 1227 (Wash. 2002).  Here, Ms.

21   Shellenberger admits she received her buyout benefit of $764.36.  (Compl. ¶¶ 57, 59.)

22   Because a buyout satisfies all of Defendants' obligations under the contract with respect

1  to a covered product, and Ms. Shellenberger admits to receiving a buyout payment for her

2  dishwasher, she received the full benefit of her bargain.

3      In sum, Ms. Shellenberger fails to allege a cognizable breach or damages.  Her

4  breach of contract claim is therefore dismissed.

5          3.  Breach of the Duty of Good Faith and Fair Dealing

6      In Washington, "there is in every contract an implied duty of good faith and fair

7  dealing that obligates the parties to cooperate with each other so that each may obtain the

8  full benefit of performance."  *Rekhter v. State, Dep't of Soc. & Health Servs.*, 323 P.3d

9  1036, 1041 (Wash. 2014) (cleaned up).  The duty of good faith and fair dealing arises

10  "only in connection with terms agreed to by the parties."  *Id.* (quoting *Badgett v. Sec.*

11  *State Bank*, 807 P.2d 356, 360 (Wash. 1991)).  But, the duty can "arise even when there

12  is no breach of an express contract term," particularly "where one party has discretionary

13  authority to determine a future contract term" such as "the formula or method used to

14  calculate a particular value in the contract."  *Id.* at 1041-42 (capitalization altered).

15  "There is no one-size-fits-all definition of good faith and fair dealing."  *Microsoft Corp.*

16  *v. Motorola, Inc.*, 963 F. Supp. 2d 1176, 1184 (W.D. Wash. 2013).  For example, it may

17  violate the duty of good faith and fair dealing to "(1) evade the spirit of a bargain;

18  (2) willfully render imperfect performance; (3) interfere with or fail to cooperate in the

19  other party's performance; (4) abuse discretion granted under the contract; or (5) perform

20  the contract without diligence."  *Id.*

21      Ms. Shellenberger's claim centers on Defendants' discretionary authority to elect a

22  repair or replacement versus a buyout.  (*See* Contract §§ 10, 20.)  Specifically, she alleges

1    Defendants breached the duty of good faith and fair dealing by (1) choosing to resolve

2    the September 2022 claim with a repair "when they knew that they had no repair

3    technicians in their network," and (2) by choosing to resolve the February 2023 claim

4    with a buyout rather than a repair, against Ms. Shellenberger's wishes.  (Compl.

5    ¶¶ 103-07.)  Assuming without deciding that the duty of good faith and fair dealing could

6    apply in this instance, Ms. Shellenberger fails to allege facts plausibly supporting a

7    breach of that duty.  Indeed, it would defy logic to permit a claim based on Defendants'

8    attempt to exercise the repair option in September 2022 when the complaint makes clear

9    that repair was Ms. Shellenberger's preferred outcome.  (*See, e.g.*, *id.* ¶¶ 18, 107.)  And

10   there is nothing unreasonable, abusive, or otherwise improper about Defendants pursuing

11   a buyout after they had already once offered to reimburse Ms. Shellenberger for a repair,

12   but she "gave up" on locating suitable repair services.  (*Id.* ¶¶ 54-57.)  The court

13   concludes Ms. Shellenberger fails to plausibly allege a breach of the duty of good faith

14   and fair dealing.  *See Iqbal*, 556 U.S. at 678; *Smart Apparel (U.S.), Inc. v. Nordstrom,*

15   *Inc.*, --- F. Supp. 3d ----, 2024 WL 1075502, at *6 (W.D. Wash. Mar. 11, 2024) (granting

16   motion to dismiss claim for breach of duty of good faith and fair dealing where plaintiff

17   failed to allege facts showing defendant improperly exercised discretion under contract).

18   This claim is therefore dismissed.

19   **E.    Leave to Amend**

20        In light of the liberal policy in favor of granting leave to amend, *Eminence*

21   *Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003), the court dismisses

22   Ms. Shellenberger's claims without prejudice and grants her leave to file an amended

1   complaint.  The court warns Ms. Shellenberger that it will not tolerate strategic omission

2   of pertinent facts that may undermine her claims.  Any amended complaint reasserting a

3   CPA claim must allege with particularity the circumstances of the fraudulent conduct by

4   providing the most complete, clear picture of the alleged facts as possible.  *See* Fed. R.

5   Civ. P. 9(b).  In particular, Ms. Shellenberger shall allege whether, when, and how she

6   received a copy of the Service Plan contract, including whether the contract was provided

7   to her at the time she received a confirmation email following her purchase of the Service

8   Plan.  (*See* Compl. ¶¶ 49-50 (alleging that after she purchased her Service Plan, Ms.

9   Shellenberger "received a confirmation email" with "details about her KitchenAid Plan,

10  such as the dates of coverage and the model number of her covered dishwasher").)

11  Failure to comply may warrant a finding of bad faith and/or sanctions, up to and

12  including dismissal of her claims with prejudice.

13                          **IV.    CONCLUSION**

14          For the foregoing reasons, the court GRANTS Defendants' motions to dismiss

15  (Dkt. ## 23, 26).  Ms. Shellenberger shall file her amended complaint, if any, by no later

16  than **October 2, 2024**.

17          Dated this 11th day of September, 2024.

18                                              _____
                                                JAMES L. ROBART
19                                              United States District Judge

20

21

22

ORDER - 27