1
2
3
4
5
6
7
8
9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

10

HADASSAH SHELLENBERGER,

CASE NO. C24-0657JLR

11

Plaintiff,

ORDER

v.

12
13

AIG WARRANTYGUARD, INC., et
al.,

14

Defendants.

15
16

## I.    INTRODUCTION

17

Before the court are Defendants AIG WarrantyGuard, Inc.'s ("AIGWG") and

18

Whirlpool Corporation's ("Whirlpool" and together with AIGWG, "Defendants")

19

motions to dismiss Plaintiff Hadassah Shellenberger's amended putative class action

20

complaint.  (AIGWG Mot. (Dkt. # 50); AIGWG Reply (Dkt. # 58); Whirlpool Mot. (Dkt.

21

# 49); Whirlpool Reply (Dkt. # 56); *see also* Am. Compl. (Dkt. # 46).)  Ms.

22

Shellenberger opposes both motions (Resp. to AIGWG (Dkt. # 53); Resp. to Whirlpool

(Dkt. # 54)),[1] and asks the court to take judicial notice of several documents that she did not refer to or attach to her amended complaint (Request (Dkt. # 55)). Defendants oppose the request for judicial notice. (Joint Opp. (Dkt. # 57).) The court has considered the motions, the parties' submissions in support of and in opposition to the motions, the relevant portions of the record, and the applicable law. Being fully advised,[2] the court DENIES Ms. Shellenberger's request for judicial notice and GRANTS Defendants' motions.

## II.    BACKGROUND

This action arises from Ms. Shellenberger's purchase of Defendants' warranty plan (the "Service Plan"), which she alleges provided less coverage than she expected for her KitchenAid dishwasher.[3] Around April 2020, Ms. Shellenberger purchased that dishwasher from Best Buy for $1,084.99 including taxes. (Am. Compl. ¶¶ 11, 38.) She also purchased a "Geek Squad Protection Plan" ("GSP Plan") at the same time. (*Id.* ¶¶ 11, 49.) Shortly thereafter, in April and May 2020, Ms. Shellenberger began receiving marketing materials from Defendants advertising the Service Plan. (*Id.* ¶¶ 40-41,

---

[1] Because the substance of Ms. Shellenberger's two responses is largely the same, the court generally refers to her response to AIGWG's motion for summary judgment, and only refers to her response to Whirlpool's motion to the extent it is substantively different. When citing the parties' submissions, the court refers to the page numbers in the CM/ECF header.

[2] Ms. Shellenberger requests oral argument (*see* Resp. to AIGWG at 1; Resp. to Whirlpool at 1), but Defendants do not (*see generally* AIGWG Mot.; Whirlpool Mot.). The court determines that oral argument would not aid in its disposition of the motions. *See* Local Rules W.D. Wash. LCR 7(b)(4).

[3] The year before Ms. Shellenberger filed this action, her counsel filed a separate putative class action, on behalf of a different named plaintiff, against the same defendants in the Central District of California. *See Salas v. Whirlpool Corp.*, No. 5:23-CV-01549-AB-KK (C.D. Cal.).

Exs. 4-6 (examples of marketing materials) (the "Marketing Materials").)  These

materials, all of which included the same language, offered the Service Plan for purchase,

described it as a "KitchenAid Service Plan[,]"[4] and summarized four benefits available

under the plan as follows:

> **KitchenAid Service Plan Benefits\***
> **No Service Fee:** No out-of-pocket expenses on covered repairs and replacements.
> **Customer Satisfaction:** U.S. based customer care center.
> **Valuable Protection:** 100% parts and labor for covered repairs, where applicable.
> **Service by KitchenAid:** Only authorized technicians.

(*Id*. ¶¶ 41-43; Marketing Materials) (emphasis in original).  The following disclaimer

language appeared at the bottom of the same page:

> \*KitchenAid Service Plans are offered, sold and issued by AIG WarrantyGuard, Inc. . . . an affiliate of American International Group, Inc. (AIG).  Limitations and exclusions apply.  See the complete terms and conditions at serviceplans.kitchenaid.com/details.  KitchenAid is not affiliated with AIG or any of its affiliates.  KitchenAid trademarks used with permission.

(*Id*.)  The Service Plan offers also included various term lengths for purchase, and they

emphasized KitchenAid's affiliation with the Service Plan by displaying KitchenAid's

branding and trademarks and representing that KitchenAid certified technicians would

provide repairs.  (*Id.* ¶¶ 42-43.)

---

[4] Whirlpool manufactures home appliances under various brand names, including KitchenAid.  (Am Compl. ¶¶ 1, 21.)

ORDER - 3

Ms. Shellenberger reviewed one of these offers or a substantially identical offer in April or May 2020.  (*Id.* ¶ 40.)  Relying on the representations in the offer, Ms. Shellenberger purchased a three-year Service Plan in May 2020.  (*Id.* ¶¶ 42-43 (describing the representations Ms. Shellenberger relied on), 51 & Ex. 7 (confirmation email that Ms. Shellenberger received).)  Ms. Shellenberger did not notice the offer's disclaimer stating that the Service Plan was offered by AIGWG, and she did not review the linked terms and conditions.  (*Id.* ¶ 48.)  After purchasing the Service Plan, Ms. Shellenberger cancelled her GSP Plan.  (*Id.* ¶¶ 49, 57.)

On May 14, 2020, after Ms. Shellenberger purchased the Service Plan, she received an email thanking her for purchasing "a genuine KitchenAid service plan."  (*Id.* ¶ 51 & Ex. 7.)  The email included details about the Service Plan but did not include a copy of the contract for the Service Plan.  (*Id.* ¶¶ 52-53.)  Instead, the email instructed her to "call KitchenAid Service Plans" or visit "serviceplans.kitchenaid.com" for questions about her plan or to request service.  (*Id.* ¶¶ 52-54, Ex. 7.)  The term of her Service Plan began on May 15, 2021, after the manufacturer's warranty for the dishwasher expired, and ended on May 14, 2024.  (*Id.* ¶ 50.)

In September 2022, a gasket on the door of the dishwasher began to fail.[5]  (*Id.* ¶ 59.)  Ms. Shellenberger submitted a claim under her Service Plan around September 12, 2022.  (*Id.*)  She called the phone number for her Service Plan and learned that there was

---

[5] This was the second time that the gasket in this location had failed.  Shortly after Ms. Shellenberger purchased her dishwasher in 2020, the gasket started to lift and sustain damage. (Am. Compl. ¶ 58.)  After contacting Whirlpool, Ms. Shellenberger obtained a replacement gasket under the manufacturer's warranty, which in turn began to fail in September 2022.  (*Id.*)

1    no in-network service available at that time. (*Id.*) A representative said that Ms.

2    Shellenberger would receive a call back when a repair service became available, but Ms.

3    Shellenberger never received a call back. (*Id.* ¶¶ 59, 64.) Ms. Shellenberger also

4    received an email from Whirlpool stating that she had the option to hire an independent

5    repair company to fix her dishwasher and to seek reimbursement from Whirlpool for the

6    expense. (*Id.* ¶ 60.)

7        Ms. Shellenberger attempted to call local repair services. (*Id.* ¶ 63.) However,

8    after "more than a week" of searching, she could not find a local service that was willing

9    to repair her dishwasher under the terms Whirlpool required.[6] (*Id.*) Ms. Shellenberger

10    then called Whirlpool multiple times in September 2022 to request repairs under her

11    Service Plan. (*Id.* ¶¶ 64-65.) She was not able to obtain repairs in September 2022, and

12    she continued to use the dishwasher. (*Id.* ¶¶ 64-65.)

13        Around February 2023, Ms. Shellenberger's dishwasher stopped working, and she

14    submitted a claim under her Service Plan. (*Id.* ¶ 66.) Defendants informed Ms.

15    Shellenberger that, under the terms of the Service Plan, they would "buy out" her

16    dishwasher by paying her $764.36 and terminating the Service Plan.[7] (*Id.* ¶¶ 66-68, 70.)

17

---

18      [6] To qualify for reimbursement, the repair service needed to comply with various

19    conditions, including performing a diagnostic service and sending Whirlpool a written repair estimate and full list of replacement parts that would be used. (Am. Compl. ¶ 61.)

20      [7] Section 20 of the Service Plan contract gave Defendants "the option, at [their] sole discretion," to satisfy "all contractual obligations" by (a) exchanging the dishwasher for a

21    replacement with similar features and functionality, or (b) buying out the dishwasher with a cash settlement based upon its original purchase price and current age, according to a fixed

22    depreciation schedule. (Am. Compl. ¶¶ 67 n.3, 70; *id.* Ex. 8 ("Contract") § 20.) For dishwashers like Ms. Shellenberger's that were between 1 year and 5 years old, the depreciation schedule set

Ms. Shellenberger used the buyout payment, supplemented with her own funds, to purchase a new dishwasher and a new warranty plan for that dishwasher.  (*Id.* ¶ 68.)

Ms. Shellenberger brought this action on May 10, 2024, asserting claims against Defendants for:  (1) violating Washington's Consumer Protection Act ("CPA"), ch. 19.86 RCW; (2) breach of contract; and (3) breach of the duty of good faith and fair dealing.  (Compl. ¶¶ 84-107.)  On September 11, 2024, the court dismissed Ms. Shellenberger's original complaint with leave to amend after concluding that she had failed to state a claim.  (9/11/24 Order (Dkt. # 45) at 12-27.)  Ms. Shellenberger filed her amended complaint shortly thereafter.  (Am. Compl.)  Defendants then moved to dismiss Ms. Shellenberger's amended complaint, arguing that her new allegations are still insufficient to state a claim, and that her claims should now be dismissed with prejudice because the claims "cannot be salvaged" by further amendment.  (Whirlpool Mot. at 31; AIGWG Mot. at 25.)

### III.    ANALYSIS

The court begins by setting forth the relevant legal standards.  It then addresses whether Ms. Shellenberger's amended complaint states a claim.

**A.    Legal Standards**

Federal Rule of Civil Procedure 12(b)(6) provides for dismissal when a complaint fails to state a claim upon which relief can be granted.  *See* Fed. R. Civ. P. 12(b)(6).  "A complaint may fail to show a right to relief either by lacking a cognizable legal theory or

---

the buyout price at 75% of the original purchase price (excluding taxes, delivery, and installation fees).  (Contract § 20.)

1 by lacking sufficient facts alleged under a cognizable legal theory." *Woods v. U.S. Bank,*

2 *N.A.*, 831 F.3d 1159, 1162 (9th Cir. 2016) (cleaned up).  A complaint must contain

3 "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its

4 face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation and citation omitted).  This

5 means that the pleaded facts must "allow[] the court to draw the reasonable inference that

6 the defendant is liable for the misconduct alleged." *Id.*

7   In ruling upon a motion to dismiss under Rule 12(b)(6), the court reviews only the

8 complaint and any attachments or documents that are incorporated by reference.  *Koala v.*

9 *Khosla*, 931 F.3d 887, 894 (9th Cir. 2019); *see also United States v. Ritchie*, 342 F.3d

10 903, 908 (9th Cir. 2003) ("Certain written instruments attached to pleadings may be

11 considered part of the pleading.  Even if a document is not attached . . . it may be

12 incorporated by reference into a complaint if the plaintiff refers extensively to the

13 document or the document forms the basis of the plaintiff's claim.").  The court accepts

14 as true all well-pleaded facts and draws all reasonable inferences in favor of the plaintiff.

15 *Caltex Plastics, Inc. v. Lockheed Martin Corp.*, 824 F.3d 1156, 1159 (9th Cir. 2016).

16 However, the court need not accept as true unwarranted deductions of fact, unreasonable

17 inferences, legal conclusions, or statements that are merely conclusory.  *See Whitaker v.*

18 *Tesla Motors, Inc.*, 985 F.3d 1173, 1176 (9th Cir. 2021); *Sprewell v. Golden State*

19 *Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).  The court also need not accept allegations

20 as true to the extent they contradict matters that are in a complaint's attachments,

21 incorporated by reference into the complaint, or properly subject to judicial notice.

22 *Curtis v. Inslee*, 709 F. Supp. 3d 1257, 1263 (W.D. Wash. 2023) (citations omitted).

**B.      CPA**

The court first discusses Ms. Shellenberger's request to take judicial notice of various documents that she did not reference in or attach to her amended complaint.  The court then discusses whether Ms. Shellenberger has stated a CPA claim.

A CPA claim has five required elements:  (1) an unfair or deceptive act or practice; (2) occurring in trade or commerce; (3) affecting the public interest; (4) injury to a person's business or property; and (5) causation.  *See Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 719 P.2d 531, 533 (Wash. 1986); *see also* RCW 19.86.020 (declaring unlawful unfair methods of competition and unfair or deceptive acts or practices in trade or commerce); RCW 19.86.090 (providing a private right of action for CPA violations).

1.   Request for Judicial Notice

Ms. Shellenberger argues that the court should take judicial notice of several documents, including documents filed in *Salas v. Whirlpool Corp.*, No. 5:23-CV-01549-AB-DTB (C.D. Cal.); a transcript of a hearing before the United States Senate Committee on Commerce, Science, and Transportation; a 2017 Global Mobile Consumer Survey published by the Deloitte consultancy; and various webpages, academic papers, and reports.  (*See* Request at 2-4.)  She asserts that these documents show that a reasonable consumer in Ms. Shellenberger's position would not have visited Defendants' website and read the Service Plan contract before purchasing the Service Plan, because "[t]he unanimous conclusion . . . is that consumers do not read the terms and conditions applicable to a service or product even when they are already on a

1  vendor's website and these terms and conditions can be accessed with a simple mouse

2  click." (*Id.* at 11.)  The court declines Ms. Shellenberger's request to take judicial notice

3  of these documents.

4         On a motion to dismiss under Rule 12(b)(6), the court reviews only the complaint

5  and any attachments or documents that are incorporated by reference.  *See Koala*, 931

6  F.3d at 894.  And courts regularly refuse to take judicial notice of facts when doing so

7  would not be relevant to the dispute or motion in question.  *See Synopsys, Inc. v InnoGrit*

8  *Corp.*, No. 19-CV-02082-LHK, 2019 WL 4848387, at *6-7 (N.D. Cal. Oct. 1, 2019)

9  ("The [c]ourt may deny a request to take judicial notice of facts that are irrelevant to the

10  instant motion."); *Bradach v. Pharmavite LLC*, No. CV 14-3218-GHK, 2015 WL

11  13767013, at *4 n.4 (C.D. Cal. Dec. 22, 2015) (denying requests for judicial notice that

12  were unnecessary for resolving a motion for judgment on the pleadings).  Although,

13  under the CPA, the court determines whether an act is deceptive in part by considering

14  whether "it had the capacity to deceive a substantial portion of the public[,]" the ultimate

15  question of deception is a question of law for the court.  *See Panag*, 204 P.3d at 894; *see*

16  *also id.* at 894-96 (discussing whether a practice was deceptive by considering judicial

17  decisions and administrative agency final orders, and comparing the language at issue to

18  the language discussed in the judicial decisions and agency orders).  The court does not

19  need to look beyond Ms. Shellenberger's complaint and attached exhibits to assess

20  whether she has stated a CPA claim and to rule upon Defendants' motions to dismiss.

21

22

1        2.  Rule 12(b)(6) and Ms. Shellenberger's New Allegations

2         Under the CPA, deception exists when "there is a representation, omission or

3   practice that is likely to mislead a reasonable consumer."  *Young v. Toyota Motor Sales,*

4   *U.S.A.*, 472 P.3d 900, 994 (Wash. 2020) (cleaned up).  "A plaintiff need not show the act

5   in question was intended to deceive, only that it had the capacity to deceive a substantial

6   portion of the public."  *Panag v. Farmers Ins. Co. of Wash.*, 204 P.3d 885, 895 (Wash.

7   2009) (cleaned up).  "Whether a particular act or practice is 'unfair or deceptive' is a

8   question of law."  (*Id.*)  As the court has already noted in its September 11, 2024 order, a

9   consumer cannot plead deception under the CPA based on "surprise" contract terms

10  where the defendant fully disclosed the terms, but the consumer failed to read them

11  before signing.  (*See generally* 9/11/24 Order at 18-19 (citing cases).)

12        In her amended complaint, Ms. Shellenberger alleges that Defendants' offer for

13  the Service Plan deceived her, and would deceive a substantial portion of the public,

14  because it contained several misrepresentations and was misleading.  (Resp. to AIGWG

15  at 15.)  The alleged problems with the offer fall into two categories.

16        First, Ms. Shellenberger alleges that the offer falsely or misleadingly represented

17  that the Service Plan would include repair or replacement benefits, no out-of-pocket

18  expenses, and 100% of required parts and labor for the full duration of the term she

19  selected.  (Am. Compl. ¶¶ 42-43, 69-71.)  She alleges that these descriptions were false

20  or misleading because, in her experience, Defendants limited their liability under the

21  contract to a one-time buyout payment capped at 75% of her dishwasher's purchase price,

22

1    and her Service Plan ended before its three-year term expired because of that buyout.  (*Id.*

2    ¶¶ 69-71; Resp. to AIGWG at 15.)

3        The court disagrees that the representations in Defendants' marketing materials

4    were false or misleading.  Defendants' offer summarized the benefits under the Service

5    Plan using only four bullet points, each with only a single line of text.  (*See* Marketing

6    Materials.)  The relevant bullet points stated that the benefits included: (1) "**No Service**

7    **Fee:**  No out-of-pocket expenses on covered repairs and replacements"; and (2)

8    "**Valuable Protection:**  100% [of] parts and labor for covered repairs, where applicable."

9    (Marketing Materials (emphasis in original)).  Ms. Shellenberger does not allege that

10   Defendants ever attempted to charge her a service fee or refused to reimburse her for the

11   full cost of a repair.  (*See generally* Am. Compl.)  Indeed, she admits that, after she filed

12   a repair claim in September 2022, Defendants told her that she could hire an independent

13   repair company and seek reimbursement, or she could wait until service was available in

14   Defendants' network.  (*Id.* ¶¶ 59-60.)  Ms. Shellenberger stopped looking for an

15   independent repair company before the month was over (*id.* ¶¶ 59, 63), and so

16   Defendants had nothing to reimburse.

17       Defendants' offer also did not contain any language promising that Defendants

18   would provide Ms. Shellenberger unlimited repairs for the entire plan term that she

19   purchased.  (*See generally* Marketing Materials.)  Instead, in multiple ways, the offer

20   indicated that its description of repair coverage did not embody the full terms of the

21   Service Plan, and it informed customers that they needed to look further to understand the

22   plan's repair benefits:  (1) it included an asterisk after the word "[b]enefits" that directed

ORDER - 11

1  readers to a disclaimer on the same page, which stated that limitations and exclusions

2  applied and provided a link to view the plan's complete terms and conditions; (2) it only

3  included four bullet point summaries of benefits (each with only a single line of text),

4  reflecting that the offer did not provide the complete terms of the contract; and (3) the

5  bullet point summaries themselves included caveats that would alert reasonable

6  consumers that limitations and exclusions applied.  Specifically, both bullet points that

7  discussed repairs stated that the plan's benefits included "covered repairs[,]" thus

8  revealing that the plan did not cover all repairs.  (*Id.*)  Additionally, the bullet point that

9  advertised 100% reimbursement for parts and labor also included the caveat "where

10  applicable." (*Id.*)  This revealed that, in certain circumstances, the stated benefit would

11  not apply.  Thus, based on the offer, reasonable consumers would understand that the

12  offer did not completely describe the Service Plan's terms and conditions, and that they

13  would need to follow the link provided and view the complete terms and conditions of

14  the Service Plan, rather than rely only upon the bullet points in the offer itself.[8]

15      Second, Ms. Shellenberger alleges that Defendants' offer misleadingly represented

16  that the Service Plan would extend her manufacturer's warranty, even though the Service

17

18      [8] As the court has already concluded, Defendants' website made the complete terms and conditions in the Service Plan contract available, and these terms and conditions were neither deceptive nor misleading.  (9/11/24 Order at 14-16.)  After reviewing the contract, a reasonable consumer would know the complete terms of the Service Plan, including that Defendants could satisfy all their contractual obligations by buying out the covered product, and that Defendants would always elect a buyout if the cost of a repair exceeded the depreciated value of the covered product.  (*Id.* at 14-15 (citing Contract §§ 10, 20); *see also* Contract § 12 (specifying that Defendants may buyout a product if they cannot repair it).)  Likewise, a reasonable customer would know that the contract obligated Defendants to pay for necessary labor and materials, but not necessarily to furnish the labor and materials.  (*Id.* at 14 (citing Contract § 1).)

1    Plan offered "materially inferior" benefits.  (*Id.* ¶¶ 69, 73, 79; Resp. to AIGWG at 15.)

2    She alleges that the offer prominently displayed KitchenAid's (but not AIGWG's)

3    branding and trademarks and urged customers to "[g]et the only plan backed by the

4    manufacturer beyond the limited standard warranty period."  (Am. Compl. ¶¶ 42, 44.)

5    Thus, Ms. Shellenberger alleges that the offer represented that the Service Plan extended

6    the manufacturer's warranty for her dishwasher and offered "comparable coverage" to

7    that warranty.  (Am. Compl. ¶ 44, 46; Resp. to AIGWG at 8-9.)  However, the offer does

8    not state that it extends the manufacturer's warranty; it states only that the Service Plan is

9    "backed by the manufacturer[.]"  (*See* Marketing Materials.)  Indeed, the offer's

10   disclaimer clarifies that the Service Plan is sold and issued by AIGWG, and the offer

11   never refers to the Service Plan as a warranty or an extension of the manufacturer's

12   warranty—it consistently refers to the Service Plan simply as a "plan[,]" and it uses the

13   term "warranty" only to refer to the manufacturer's warranty.[9]  (*Id.*)

14        In sum, after reading Defendants' offer, a reasonable consumer would realize that

15   it does not contain all applicable terms and conditions, and the consumer would know to

16   follow the link in the disclaimer to view the terms and conditions.  The offer does not

17   contain false or misleading language; it purports only to provide a summary of benefits in

18   four bullet points, it includes a disclaimer, and it also contains multiple caveats in its

19

20        [9] The court also has already declined to credit Ms. Shellenberger's allegation that the
     Service Plan provides inferior access to certified technicians than the manufacturer's warranty
21   because Ms. Shellenberger did not provide a copy of the manufacturer's warranty or allege any
     concrete facts regarding the availability of technicians under that warranty.  (9/11/24 Order
     at 15 n.3.)  Ms. Shellenberger did not amend these allegations in filing her amended complaint.
22   (*See generally* Am. Compl.)

ORDER - 13

1    summary of benefits to alert consumers that limitations and exclusions apply and that

2    they must read further to find the complete terms and conditions of the Service Plan.  As

3    the court has already held, the Service Plan contract fully discloses all relevant terms and

4    would not mislead or deceive a reasonable consumer.  (*See* 9/11/24 Order at 14-16.)

5    Thus, Ms. Shellenberger has failed to plausibly state a CPA claim.[10]

6    **C.    Breach of Contract**

7            The court turns to Ms. Shellenberger's breach of contract claim.  In Washington, a

8    breach of contract claim requires:  (1) a contract that imposes a duty; (2) breach of that

9    duty; and (3) economic damage as a result of that breach.  *Myers v. Dep't of Soc. &*

10   *Health Servs.*, 218 P.3d 241, 243 (Wash. Ct. App. 2009).

11           Ms. Shellenberger alleges that Defendants breached Sections 1 and 10 of the

12   Service Plan contract, which provide in relevant part:

13           **1.  WHAT IS COVERED.**  We will furnish labor, parts, and/or replacement
             equipment (or pay for same) necessary to repair operational or mechanical
14           breakdowns of the product[] . . ., provided such service is necessitated by
             product failure during normal usage.  The product[] specified and covered
15           includes only equipment as originally configured.  Coverage also applies to
             the parts and accessories that are necessary to the covered product's
16           functionality, but does not apply to accessories that are used in conjunction
             with or to enhance the performance of the covered product.

17                                          * * *

18

19
     _____
20        [10] In its prior order, the court also discussed the causation element of a CPA claim and
     concluded that Ms. Shellenberger's allegations were not sufficient to establish this element
21   either.  (9/11/24 Order at 20-21.)  Because the court concludes that Ms. Shellenberger has failed
     to allege deception even after refining her allegations, and because all elements of a CPA claim
22   are necessary, the court does not address the causation element.  Likewise, the court does not
     address Federal Rule of Civil Procedure 9(b).

ORDER - 14

> **10.    SERVICE EVENT.**  After we authorize your claim, we will at our option complete the lesser of (a) the repair of your product with new or refurbished parts, or (b) exchange or buyout your product as provided in Section 20.  The decision to repair your product or exchange or buyout will be made solely by us[.]

(Contract §§ 1, 10 (cleaned up) (emphasis in original).)  She alleges that these sections required Defendants to repair her dishwasher in response to her September 2022 claim, and that Defendants breached their obligation by failing to do so, waiting until she submitted another claim in February 2023, and then buying out her dishwasher without addressing her 2022 claim.  (Am. Compl. ¶¶ 59-66, 111-15; Resp. to AIGWG at 25.)  Ms. Shellenberger also argues that Sections 12 and 20 of the Service Plan contract, which allow Defendants to buy out her dishwasher with a cash payment, do not excuse Defendants from breaching their obligations as to her 2022 claim.  (Resp. at 26-27.)  In relevant part, the buyout provisions read as follows:

> **12.    UNABLE TO REPAIR.**  If we determine that we are unable to repair your product or we determine that a replacement is necessary, we will exchange or buyout your product as provided in Section 20. . . . All contractual obligations for the specified product are fulfilled, in lieu of repairs, upon exchange or buyout of your product.

> \* \* \*

> **20.    EXCHANGE OR BUYOUT.**  We have the option, at our sole discretion, to (a) exchange your product with a replacement product with similar features and functionality, or (b) buyout your product with a cash settlement based on the original purchase price of the covered product, excluding taxes, delivery and installation fees.  The value of the exchange or buyout will be determined according to the age of the covered product using the following depreciation schedule:

> **Product Age** . . .
> 1-5 years . . . 75% of original purchase price . . .
> 6-10 years . . . 45% of original purchase price . . .

ORDER - 15

11-15 years . . . 25% of original purchase price . . .

You have up to forty-five (45) days from the date of authorization to complete your product buyout transaction. We will have satisfied all contractual obligations owed for the specified product if we exchange or buyout your product under this section[.]

(Contract §§ 12, 20 (cleaned up) (emphasis in original).)

The court disagrees with Ms. Shellenberger that Defendants breached the Service Plan contract. Even accepting her allegations that her 2022 and 2023 claims were separate from each other and unrelated (Am. Compl. ¶¶ 116, 119), the court concludes that the contract did not obligate Defendants to furnish parts and labor to fix Ms. Shellenberger's dishwasher in 2022 because it gave Defendants the option of reimbursing Ms. Shellenberger instead for obtaining a suitable repair. (*See* Contract § 1 (providing that Defendants could either "furnish" or "pay for" necessary parts and labor for repairs).) Ms. Shellenberger never obtained a suitable repair after she submitted her 2022 claim. (Am. Compl. ¶¶ 63, 65.) Because Ms. Shellenberger admits that she never obtained repair services herself and that she stopped looking before the month was over, she never triggered Defendants' obligation under the Service Plan contract to reimburse her for the repair.

Separately, as the court has already concluded, the 2023 buyout resolved all of Defendants' contractual obligations related to Ms. Shellenberger's dishwasher. (9/11/24 Order at 24 (citing Contract §§ 12, 20).) Contrary to Ms. Shellenberger's assertions (Resp. to AIGWG at 28-30), a buyout under the Service Plan contract is not claim-specific: it applies to "all contractual obligations owed for the specified *product*[.]"

1  (Contract § 20 (cleaned up and emphasis added).)  Defendants gave Ms. Shellenberger

2  the option to accept a buyout payment in 2023, and she accepted it.  (Am. Compl. ¶¶ 66,

3  68.)  When she did so, Defendants satisfied all their obligations as to her dishwasher—

4  not just her 2023 claim.[11]  Accordingly, Ms. Shellenberger has failed to plausibly allege a

5  breach of a contractual duty, and therefore a breach of contract claim.

6  **D.    Breach of the Implied Covenant of Good Faith and Fair Dealing**

7      In Washington, all contracts include an implied covenant of good faith and fair

8  dealing,[12] which requires parties "to cooperate with each other so that each may obtain

9  the full benefit of performance."  *Rekhter v. Dep't of Soc. & Health Servs.*, 323 P.3d

10  1036, 1041 (Wash. 2014) (citation omitted).  The implied covenant arises only in

11  connection with terms to which the parties have agreed, and it cannot contradict express

12  contract terms.  *See id.*  "The duty of good faith requires 'faithfulness to an agreed

13

14      [11] Ms. Shellenberger also argues that the court should interpret the contractual language
to require Defendants to promptly repair her dishwasher, which would honor her expectations
15  that Defendants would perform a prompt repair after she submitted her 2022 claim.  (Resp. to
AIGWG at 26-27.)  In support, she points to language in Defendants' marketing materials
16  acknowledging consumers' "everyday reliance" on products like her dishwasher and urging
consumers to contact Defendants to "schedule service at a time that is convenient[.]"  (*Id.* at 27
(quoting Marketing Materials).)  However, although courts can consider the context during
17  contract formation to assist in interpreting contracts, courts cannot rely upon that context "to
vary, contradict, or modify the written word" of the contract.  *See Viking Bank v. Firgrove
18  Commons 3, LLC*, 334 P.3d 116, 120 (Wash. App. 2014) (cleaned up).  Here, the Service Plan
contract allows Defendants to proceed as they did, and the contract contains no provision
19  requiring Defendants to act on claims within a particular time or before initiating a buyout on a
later claim.  (*See generally* Contract.)  Moreover, the contract states that it is the "entire
20  [c]ontract" (Contract § 24), meaning that the contract does not include the statements in
Defendants' marketing materials.

21      [12] Washington courts sometimes refer to this implied covenant simply as a duty of good
faith and use the two terms interchangeably.  *See, e.g., Edmonson v. Pophcoi*, 256 P.3d 1223,
1227 (Wash. 2011); *Badgett v. Sec. State Bank*, 807 P.2d 356, 360 (Wash. 1991).  The court does
22  the same.

1    common purpose and consistency with the justified expectations of the other party.'"

2    *Edmonson v. Popchoi*, 256 P.3d 1223, 1227 (Wash. 2011) (quoting Restatement (Second)

3    of Contracts § 205 cmt. a (1981)).  "Bad faith may be overt or may consist of inaction."

4    *Id.* (quoting Restatement (Second) of Contracts § 205 cmt. d (1981)) (cleaned up).  It can

5    include evading the spirit of the bargain, lacking diligence, willfully rendering imperfect

6    performance, abusing the power to specify terms, and failing to cooperate in the other

7    party's performance.  Restatement (Second) of Contracts § 205 cmt. d (1981).[13]

8         Ms. Shellenberger argues that Defendants breached their duty of good faith by:

9    (1) failing to staff their repair network with enough technicians to repair Ms.

10   Shellenberger's dishwasher promptly; and (2) attempting to repair her dishwasher in

11   September 2022 even though they knew that they could not do so in the foreseeable

12   future, rather than immediately replacing the dishwasher or buying it out.  (Resp. to

13   AIGWG at 29-31.)  In essence, she asserts that the contract entitled her to "a [] benefit for

14   each claim she submitted" (*id.* at 29), and that Defendants frustrated this contractual

15   purpose by improperly using the discretion that they had under the contract (Am. Compl.

16   ¶¶ 124-27).

17        The court disagrees.  Regardless of any failure by Defendants to repair her

18   dishwasher in September 2022, her dishwasher still qualified for the largest buyout

19   possible under the Service Plan contract when Ms. Shellenberger received the buyout

20

21       [13] "Washington courts consistently rely on the Restatement (Second) of Contracts in
     defining the parameters of the duty of good faith and fair dealing."  *Microsoft Corp. v. Motorola,*

22   *Inc.*, 963 F. Supp. 2d, 1176, 1184 n.4 (W.D. Wash. 2013) (citing cases).

1    payment in February 2023.  (*See* Am. Compl. ¶ 66; Contract § 20 (specifying that

2    products one to five years old receive a buyout of 75% of the purchase price, and that

3    older products receive either a 45% or 25% buyout payment depending upon their age).)

4    So long as Ms. Shellenberger's dishwasher remained in the same depreciation category

5    and qualified for the same buyout payment—which is exactly what allegedly happened

6    here—a five-month delay in buying out the dishwasher did not abuse Defendants' powers

7    under the contract.  Instead, it benefitted Ms. Shellenberger because she received the

8    same buyout payment as she would have without the delay, even though she was able to

9    continue to use the dishwasher in the interim, and even though the dishwasher was older,

10   more worn, and ultimately less valuable when the buyout occurred.[14]  In sum, Ms.

11   Shellenberger's allegations show only that Defendants did not prevent her from receiving

12   the full benefit under the contract.  Her amended complaint fails to state a claim for

13   breach of the implied covenant of good faith and fair dealing.

14

15   _____

16   [14] Ms. Shellenberger also argues that it is unreasonable to interpret the Service Plan
     contract as allowing a buyout to resolve her prior claims because "Defendants would be
     permitted to receive multiple claims . . . over the course of her three-year plan without providing
17   any benefits to her and then resolve this accumulation of unresolved claims with a single buyout
     once Plaintiff's three-year plan expires."  (Resp. to AIGWG at 24.)  The court disagrees for two
18   reasons.  First, Ms. Shellenberger's allegations do not support that this happened here:
     Defendants offered to reimburse her after her September 2022 claim if she arranged for a
     suitable repair, she did not arrange the repair, and then Defendants bought out her dishwasher
19   after her February 2023 claim (even though over a year remained on her Service Plan at that
     time).  Second, a plaintiff who believed that Defendants were abusively timing a buyout or were
20   otherwise using their contractual discretion in bad faith could simply bring suit in lieu of
     accepting a buyout payment.  (*See* Contract § 20 (providing customers like Ms. Shellenberger 45
21   days to determine whether to complete a buyout transaction).)  Without an accepted buyout, the
     buyout provision of the contract will not satisfy Defendants' contractual obligations, and a
22   purchaser could pursue a claim against Defendants for breach of contract.  (*Id.*)

1    **E.    Leave to Amend**

2        If a complaint fails to state a claim, courts typically allow a plaintiff to amend the

3    complaint unless "any amendment would be an exercise in futility[.]"  *Hoang v. Bank of*

4    *Am., N.A.*, 910 F.3d 1096, 1103 (9th Cir. 2018).  When it last dismissed Ms.

5    Shellenberger's claims, the court did so without prejudice and granted Ms. Shellenberger

6    leave to amend.  (9/11/24 Order at 26-27.)  Defendants now argue that the court should

7    dismiss this action with prejudice because, among other things, Ms. Shellenberger largely

8    has not changed her allegations, she relies upon several of the same arguments that the

9    court has already rejected, and the relevant language in the Service Plan contract and

10    Defendants' marketing materials shows only that Ms. Shellenberger cannot state a

11    plausible claim.  (*See* AIGWG Reply at 6 n.1, 7, 13, 15.)  The court agrees with

12    Defendants.  Although Ms. Shellenberger makes some relevant changes in her amended

13    complaint, the differences do not change the court's analysis under Rule 12(b)(6).

14        Specifically, Ms. Shellenberger adds to her CPA claim that she relied upon the

15    "prominent display of KitchenAid's . . . branding and trademarks" in Defendants' offer

16    for the Service Plan, as well as a statement in the offer urging the reader to "[g]et the only

17    plan backed by the manufacturer beyond the limited standard warranty period."  (Am.

18    Compl. ¶¶ 42-44.)  She omits the allegation (and exhibit) in her original complaint

19    concerning an undisclosed time when she visited the KitchenAid website to view an

20    unspecified representation by Defendants.  (*Compare* Compl. ¶ 46, Ex. 7 *with* Am.

21    Compl.).  Thus, her amended complaint focuses only on the representations she alleges

22    Defendants made in the Service Plan offer.  (Am. Compl. ¶¶ 40-49; Marketing

1   Materials.)  Ms. Shellenberger also clarifies that she did not receive a copy of or read the

2   contract for her Service Plan before purchasing the plan, and she admits that the offer for

3   the Service Plan included a disclaimer that "urges the reader to visit Defendants' website

4   to read the complete terms and conditions governing the plan[,]" which she states that she

5   "did not notice[,]"[15]  (*Id.* ¶¶ 48, 53.)  None of this detail changes the court's prior analysis

6   of Ms. Shellenberger's CPA claim, and the court continues to conclude that the language

7   of the marketing materials and the Service Plan contract would not deceive a reasonable

8   consumer.  As the court stated previously, "Ms. Shellenberger cannot ignore readily

9   available contract terms and then plausibly claim she was deceived by those terms."

10  (9/11/24 Order at 19.)  The court does not see how further amendment by Ms.

11  Shellenberger could state a plausible CPA claim.

12          As for Ms. Shellenberger's claims of breach of contract and breach of the implicit

13  covenant of good faith and fair dealing, the language of the Service Plan contract

14  controls.  Ms. Shellenberger admits that Defendants completed a buyout (which satisfies

15  all of Defendants' contractual obligations), and Ms. Shellenberger has again failed to

16

17  ───────────────

       [15] Most of Ms. Shellenberger's remaining additions to her amended complaint concern
18  her beliefs about and interpretations of Defendants' statements.  Specifically, she alleges that
    when she purchased the Service Plan, she relied upon her belief that she would receive repair or
19  replacement coverage "for the full length of the plan term she selected"; that she "was being
    offered a better plan backed by the manufacturer of her appliance, and for a lower price"; and
    that she "was being offered a plan that . . . would extend the coverage she received under her
20  [manufacturer's] warranty"; and that Defendants would "ensure[] that [Service] Plan purchasers
    receive a level of coverage comparable to the KitchenAid manufacturer's warranty."  (Am.
21  Compl. ¶¶ 11, 44-45, 48.)  Ms. Shellenberger now alleges that she relied upon Defendants'
    representations and her beliefs, and that these were both material in her decision to purchase a
22  Service Plan.  (*See, e.g.*, *id.* ¶¶ 45, 49, 57.)

1  plausibly allege a breach of Defendants' duty of good faith because she ultimately

2  received full performance under the contract.  The court does not see how Ms.

3  Shellenberger can further amend her complaint to plausibly state a claim, particularly

4  while also following the court's prior directive to avoid "strategic omission of pertinent

5  facts[.]"  (9/11/24 Order at 27.)  Accordingly, the court concludes that further amendment

6  would be futile and dismisses Ms. Shellenberger's claims with prejudice.

7  **IV.    CONCLUSION**

8  For the foregoing reasons, the court GRANTS AIGWG's motion to dismiss

9  (Dkt. # 50) and GRANTS Whirlpool's motion to dismiss (Dkt. # 49).  The court DENIES

10  Ms. Shellenberger's request for judicial notice (Dkt. # 55) and DISMISSES

11  Ms. Shellenberger's amended complaint, and this action, with prejudice.

12

13  Dated this 3rd day of February, 2025.

14

15  JAMES L. ROBART
    United States District Judge

16

17

18

19

20

21

22